FILED
2015 Jul-01 PM 02:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| HEALTH ASSURANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 2:12-cv-03634-JHE |
| | ) | |
| ADVANCED CORRECTIONAL HEALTHCARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Health Assurance, LLC ("Health Assurance") asserts one claim for tortious interference with a contract against Defendant Advanced Correctional Healthcare, Inc. ("ACH").[1] (*See* doc. 13). ACH moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 39). The motion is fully briefed and ripe for review. (Docs. 43 & 44). For the reasons stated below, the undersigned recommends ACH's motion for summary judgment, (doc. 39), be **GRANTED**.

## I. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986).

[1] Defendants Jefferson County, Alabama and Sheriff Mike Hale have been dismissed from this action. (Docs. 13 & 25).

The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Jurisdiction

Because the information in the amended complaint, (doc. 13), was insufficient to determine whether this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332, the undersigned ordered Health Assurance to file a revised complaint including the necessary factual

allegations. (Doc. 45). Health Assurance filed a Second Amended Complaint containing sufficient factual allegations, including the citizenship of each member of the unincorporated business entity and both the state of incorporation and the principal place of business of the corporation. (Doc. 46); *see Rolling Greens MHP, L .P. v. Comcast SCH Holdings LLC*, 374 F.3d 1020, 1022 (11th Cir. 2004); *Muscle Shoals Associates, Ltd. v. MHF Ins. Agency, Inc.*, 792 F. Supp. 1224, 1226-27 (N.D. Ala. 1992). Finding the matter in controversy to exceed $75,000, exclusive of interest and costs, and the action being between citizens of different states, the undersigned is satisfied that subject-matter jurisdiction is present.

## III. Summary Judgment Facts[2]

Health Assurance, LLC ("Health Assurance") began providing medical care and treatment to inmates of the Jefferson County Jail in early 2007 pursuant to a contract dated February 7, 2007. (Doc. 39-10 at 11-31). Various extensions were granted to this contract after its original term, culminating in a renewal in December 2009, which was to expire on September 30, 2010. (*Id.* at 33-53). Both health services contracts contained a ninety-day automatic extension clause, which was amended on or about December 10, 2010, to change the contract to a month-to-month term. (*Id.* at 55-56). Dr. Michael Chandler, the contract monitor tasked with auditing the health services provided to the county, testified that Health Assurance performed well during its tenure with Jefferson County. (Doc. 39-7 at 12 (41:9-21)).

On or about December 2, 2010, the Jefferson County Commission issued a Request for Proposal ("RFP") seeking bids from parties interested in providing health care services to inmates. (Doc. 39-10 at 58-86). Interested parties were allowed to submit questions and tour the

[2] Health Assurance did not respond to each fact paragraph set forth in ACH's Motion for Summary Judgment as required by Appendix I to the Scheduling Order. (Doc. 30, App'x. I at § D(2)(a)). To the extent Health Assurance did not dispute the facts in ACH's Motion, those facts are deemed admitted and have been considered by the undersigned. (*See id.*).

facility prior to submitting bids, which were ultimately due on January 21, 2011. (*Id.*).

Sheriff Mike Hale formed a committee to advise him on the bids and to review presentations made by selected vendors in April 2011. (Doc. 39-8 at 6 (19-20)). This Committee was comprised of Dr. Michael Chandler, the health services contract monitor, Captain Ron Eddings, the jail supervisor, and the Sheriff's counsel, Rob Riley, Esq. and Jay Murrill, Esq. (*Id.*). The Committee's first task was to review initial bids and determine which companies could potentially do the job. (Doc. 39-10 at ¶ 19). After an initial review, the Committee narrowed down the group of bidders to Health Assurance, ACH, and NaphCare. (*Id.*). The Committee decided to ask for revised bids from the three remaining bidders. (Doc. 39-7 at 11 (37) & doc. 39-11 at ¶ 9).

As part of this process, on March 11, 2011, (after the sealed bids were opened, but prior to presentations) Sherriff's counsel Jay Murrill, Esq. ("Murrill") emailed Lorrie Leuthold, ACH's Director of Business Development and Client Services, and asked for a revised bid based on an attached staffing plan or "staffing matrix." (Doc. 39-15 at 33-34). The staffing plan Murrill sent to ACH was the staffing plan Health Assurance currently used to staff the Jefferson County Jail. Murrill did not inform ACH where the staffing numbers originated. (Doc. 39-11 at 4, ¶11). ACH revised its bid to price it according to the provided staffing matrix and emailed it to the County no later than Tuesday, March 15, 2011. (Doc. 39-6 at 9 (31:4-7)).

Around the same time, Murrill requested NaphCare submit a revised bid conforming to the same staffing matrix. (Doc. 39-11 at ¶ 10). Like ACH, Murrill (nor anyone else) informed NaphCare where the staffing numbers originated. (*Id.* at ¶ 11).

On April 5, 2011, Murrill sent Dr. Reddix (with Health Assurance) an email. (Doc. 43-2). Murrill attached a copy of the staffing matrix and asked Health Assurance to confirm,

among other things, that its proposal was based on the staffing matrix and, if not, to do so and specify any changes. (Doc. 43-2). There is no evidence Health Assurance provided the staffing matrix with its original proposal. (*See* doc. 39-14). Health Assurance also submitted a revised bid at the request of Sheriff's counsel. (*See* doc. 39-15.).

According to Murrill, the requests for revised bids were part of the Committee's effort to make an "apples-to-apples" comparison among the three remaining bidders. (Doc. 39-11 at ¶11). He did not see an issue sharing the staffing information with the three remaining bidders because the Sheriff's Office considered the staffing matrix public information. (Doc. 39-10 at ¶11). Specifically, the 2007 and 2009 health services contracts with Health Assurance each provided the staffing matrix was to become part of the contract itself. (Doc. 39-10 at 12-54, ¶2.1). As the contracts are publically available, the staffing matrices would have also been public information. (Doc. 39-10 at ¶9).

In April 2011, delegates from Health Assurance, ACH, and NaphCare made presentations to the Sheriff's selection committee. (Doc. 39-8 at 7 (21)). Captain Eddings testified he recommended the County keep Health Assurance and, to the best of his memory, he recalled the recommendation being unanimous. (*Id.*). Dr. Chandler, however, testified he recalled the committee recommending ACH. (Doc. 39-7 at 10 (34:9-11)). Regardless of the committee's official recommendation, Sheriff Hale made the final decision and selected ACH. (Doc. 39-10 at 5, ¶16). However, Sheriff Hale did not make an immediate decision due to budgetary concerns in the Spring and Summer of 2011,[3] and received alternative proposals from Health Assurance and ACH in October 2011. (Doc. 39-4 at 24 (91) & doc. 39-11 at ¶ 13).

After submitting its bids, Health Assurance continued to provide medical services to the

[3] Jefferson County filed for bankruptcy on November 9, 2011. *See In re Jefferson County, Alabama*, U.S. Bankr. Ct., N.D. Ala., Case No. 11-05736-TBB-9 (2011).

jail on a month-to-month basis and was not informed that it would not be given a long-term contract until later. On October 21, 2011, ACH personnel flew to Birmingham, Alabama, to sign the contract. The ACH Contract was for $ 2,368,262.98, which was more than $1,000,000.00 less than any of Health Assurance's bids. (Doc. 39-10 at ¶ 24). On October 26, 2011, Sheriff Hale wrote to Dr. Reddix terminating the contract, effective 12:00:01 a.m. on December 1, 2011. (Doc. 43-2 at 4-6). Health Assurance contends losing this contract caused it to lose revenue, (doc. 43 at 10), and ACH disputes that Health Assurance can show the revenue Health Assurance lost as a result of losing the Jefferson County contract, (doc. 44 at 8).

At the time ACH took over operations of the Jefferson County Jail, Deborah Ash was Director of Medical Operations. (Doc. 43-1 at 2 (5-6)). When asked how she creates a staffing matrix, Ash testified "to come up with a staffing matrix I will look at the number of hours the facility has requested. I look at the average daily population. And I do my best to create a matrix that I think will meet the needs of the facility. . . . Then . . . once awarded a contract, then I would tweak that based on the needs. We've changed the setup of the matrix ever since we started at Jefferson because we needed to create a plan that meets their needs the best." (*Id.* at 8 (30-31)). Ash further testified that "[i]n some situations the facility shares [staffing] information." (*Id.* at 24 (96)). Ash explained this staffing information isn't something she'd send to a competitor "just on [her] own," but that a current staffing plan is one thing ACH "pretty consistently asks for" from a facility when preparing a bid. (*Id.* at 24 (94, 96-97)). Additionally, Dr. Norman Johnson, ACH's CEO, testified "by definition all staffing matrixes need to be public information." (Doc. 39-3 at 19 (72)).

**IV. Analysis**

Health Assurance asserts one claim for tortious interference with a contractual

relationship based on ACH using Health Assurance's staffing matrix to submit its revised bid. (*See* doc. 43 at 11-15); *see Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir.2000) ("[F]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) (stating that it is not the duty of the court to uncover and discuss every potential argument that can be made).

To sustain such a claim, a plaintiff must show:

> (1) The existence of a contract or business relationship;
> (2) The defendant's knowledge of the contract or business relation;
> (3) Intentional interference by the defendant with the contract or business relation;
> (4) Absence of justification for the defendant's interference; and
> (5) Damages to the plaintiff as a result of the defendant's interference.

*Micor Indus., Inc. v. C2JS Holdings, Inc.*, No. 12-S-02654-NE, 2012 WL 5931707, *6 (N.D. Ala. Nov. 26, 2012) (citing *Gross v. Lowder Realty Better Homes & Gardens*, 494 So.2d 590, 596-97 (Ala.1986)). Furthermore, the defendant must be a "stranger" to the contractual relationship at issue. *See Walk, Inc. v. Zimmer, Inc.*, No. 2:13-cv-01743-JEO, 2014 WL 2465311, *11 (N.D. Ala. May 30, 2014). The parties do not dispute the existence of a business relationship between Health Assurance and Jefferson County, ACH's knowledge of that relationship, or that ACH was a "stranger" to the relationship.

Health Assurance's sole argument is that ACH used proprietary information belonging to Health Assurance (i.e, the staffing matrix) to revise its bid, which resulted in ACH having an unfair advantage directly leading to it being awarded the contract. (Doc. 43 at 12-13). Health Assurance has provided no evidence to contradict ACH's proffered evidence that the staffing matrix at issue (1) was considered public information by the Sheriff's Office; (2) was never marked proprietary, confidential, or a trade secret by Health Assurance; or (3) was not revealed

to ACH as Health Assurance's staffing matrix. To the contrary, Health Assurance offers no evidence from which a reasonable juror could conclude ACH improperly acquired or improperly used the staffing matrix.

Despite Health Assurance's unsupported contention it included the staffing matrix in its original, sealed bid,[4] the undisputed evidence demonstrates the staffing matrix was part of the publically available health services contracts. Furthermore, upon receiving bids and narrowing the field down to three potential providers, counsel for the Sheriff requested all three potential providers revise their bids based on the staffing matrix. No one told ACH where the staffing number originated or that it was the same matrix Health Assurance used. The staffing matrix was never specified, marked, labeled, or treated as proprietary, confidential, or a trade secret. ACH simply responded to counsel's request and updated its bid accordingly. Health Assurance also submitted a revised bid after being asked to confirm it had used the same staffing matrix to formulate its bid. (*See* doc. 39-2). There is simply no evidence of wrongdoing by ACH.

Furthermore, there is no evidence to support Health Assurance's contention that the staffing matrix is a trade secret. To determine whether information constitutes a trade secret, Alabama courts consider the following factors:

> (1) The extent to which the information is known outside of [its] business;
> (2) The extent to which it is known by employees and others involved in [its] business;
> (3) The extent of measures taken by [the company] to guard the secrecy of the information;
> (4) The value of the information to [the company] and to [its] competitors;
> (5) The amount of effort or money expended by [the company] in developing the information;
> (6) The ease or difficulty with which the information could be properly acquired or duplicated by others.

---

[4] Even if Health Assurance had included the staffing matrix within its sealed bid, Health Assurance stated in its Opposition to Summary Judgment that the bids were publically opened upon the expiration of the January 21, 2011 deadline. (Doc. 43 at ¶ 5).

*Mason v. Jack Daniel Distillery*, 518 So. 2d 130, 132-33 (Ala. 1987) (quoting *Restatement (Second) of Torts*, § 757, cmt. b (1939)); *see* Ala. Code § 8-27-2 (1975). Health Assurance argues the staffing matrix is a trade secret because it did not provide the information to its competitors and it submitted its original bid as sealed. (Doc. 43 at 14). Health Assurance further states it took "all appropriate precautions to protect its investment," and the staffing plan was not in the public domain until it was transmitted to ACH. (*Id.*). These contentions are simply not supported by the record.

As to the first two factors (the extent to which the information is known outside of the company's business and the extent to which it is known by employees and others involved in its business), the staffing matrix was known by Health Assurance's staff and the Sheriff's staff and counsel. Furthermore, the Sheriff's Office considered the information public. These factors weigh against the information being considered a trade secret. As to the third factor (the extent of measures taken by the company to guard the secrecy of the information), Health Assurance contends it tried to keep the staffing matrix secret by including it in a sealed bid. This is unsupported and contradicted by the record. There is no evidence Health Assurance included the staffing matrix in its original bid. (Doc. 39-14 at 32-78 & doc. 39-4 at 9 (29-30)). Furthermore, Health Assurance never marked the staffing matrix as proprietary, confidential, or a trade secret. In fact, the staffing matrix was part of the 2007 and 2009 health services contracts, which are public information. (Doc. 39-10). Health Assurance has not offered evidence to carry the third factor.

As to the fourth factor (the value of the information to the company and to its competitors), the staffing matrix may have value to Health Assurance and its competitors, but this value was limited. ACH's Director of Medical Operations, Deborah Ash, testified ACH

often has to change its staffing model after it starts at a jail. (Doc. 43-1 at 8 (30-31)). Thus, while the staffing matrix is valuable to Health Assurance, its value to competitors is limited. Someone else's staffing plan is really only a starting point, and here it's clear the County asked ACH and other bidders to use the staffing matrix so it could compare the bids based on a common model.

The fifth factor, the amount of effort or money expended in developing the information, does not weigh heavily in Health Assurance's favor. Although it requires effort and money to develop a staffing matrix, Health Assurance has not shown that developing its staffing matrix required an inordinate number of hours or great expense. The sixth factor, the ease or difficulty with which the information could be properly acquired or duplicated by others, also weighs against the staffing matrix being considered a trade secret. As previously stated, the Sheriff's Office considers the staffing matrix public information, and the public health services contracts each provided the staffing matrix was to become part of the contract itself. As the contracts are publically available, the staffing matrices would have also been public information.

Although what constitutes a trade secret is a question of fact, *see Public Sys., Inc. v. Towry*, 587 So. 2d 969, 972 (Ala. 1991), Health Assurance fails to offer evidence to create a genuine issue of material fact regarding the propriety of the staffing matrix. There is simply no evidence of wrongdoing on behalf of ACH to support a claim for tortious interference with contractual relations, and ACH's motion for summary judgment is due to be granted.

## V. Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** ACH's motion for summary judgment, (doc. 39), be **GRANTED**, and this action **DISMISSED WITH PREJUDICE**.

## VI. Notice of Right to Object

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), Fed. R. Civ. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.

DONE this 1st day of July 2015.

**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE